**Robert Marvin WALLACE, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 06–01–00068–CR.**

Court of Appeals of Texas, Texarkana.

Submitted Dec. 5, 2001.

Decided March 20, 2002.

Rehearing Overruled May 7, 2002.

---

1. This court has approved unequal divisions, but these were not based upon an erroneous premise.

Judy Hodgkiss, J. Stephen Walker, Moore Law Firm, LLP, Paris, for appellant.

Gary L. Waite, Asst. County Atty–Appellate Section, Paris, for appellee.

Before CORNELIUS, C.J., GRANT and ROSS, JJ.

## OPINION

Opinion by Chief Justice CORNELIUS.

Robert Marvin Wallace was convicted of aggravated assault with a deadly weapon, TEX. PEN.CODE ANN. § 22.02(a)(2) (Vernon 1994). A jury found him guilty and set his

punishment, enhanced by one prior conviction, at twenty-five years' imprisonment.

The offense occurred on July 20, 2000, in the mobile home park where Bert Babb, his girlfriend, Betty Beth Merritt, and Randy Molaris, the victim, resided. At about 7:30 or 8:00 that evening, Sabra Stansell, Amy Smith, and a man identified as Wallace, entered Babb's mobile home. The man began beating Molaris, who had been sitting on the couch watching television, with a metal baseball bat, causing severe injuries to Molaris' head and arm. Molaris picked up a nearby wooden rocking chair and put it in front of him, which the assailant smashed with the bat before again striking Molaris. One of the witnesses heard Wallace say to the victim something like, "how do you like being beaten up?" Wallace then left the mobile home, accompanied by Stansell and Smith, got into a car parked outside, and left. There was testimony that another female, identified later as Jennifer Mullins, had come with the group in the car but had not entered Babb's mobile home.

Sabra Stansell, Amy Smith, Bert Babb, Betty Beth Merritt, and the victim, Molaris, all gave eyewitness testimony identifying Wallace as the person who struck Molaris five or six times with the metal bat. Two other witnesses who saw Wallace at other times before or shortly after the assault identified him in a police photographic display. Two neighbors, Megan Streety and Melissa Layton, who were sisters, were outside when a car containing three females and one male came up to Babb's mobile home. They noticed the car because it had the name "Jennifer" stenciled on it. Although their versions were slightly different, they both said they saw at least two of the females and the man go into the mobile home. They heard a lot of screaming coming from inside the mobile home, and then saw the two females and the man come out and leave; the man was carrying a baseball bat.

There was testimony that Stansell was angry with Molaris because about a month before this incident, Molaris and Babb had gotten into a fight and Molaris had struck Babb, blackening both of his eyes. There was also testimony that Stansell, Smith, and Mullins had been drinking all day, had come for a short visit to Babb's mobile home and left, presumably to get more beer, and that they returned with Wallace.

Stansell, during what was apparently a day of continuous drinking, visited Babb's mobile home earlier on July 20, along with Smith and Jennifer Mullins,[1] Wallace's sister. Stansell then returned to her own house, where Wallace was visiting. After more drinking and talking, Wallace went with Stansell, Smith, and Mullins back to Babb's mobile home. Stansell made Wallace aware of her dislike for Molaris.

Stansell and Smith testified that they each initially gave a false description of the man who attacked Molaris, calling him "Billy," and that they gave the false statements to protect Wallace.

Several witnesses testified for the defense and said that Wallace and Mike Allen were in Dallas on July 20, 2000, the date of the incident, immediately after Wallace had purchased a new truck. This alibi testimony was refuted by the salesman who sold the truck to Wallace. He said he sold the truck to Wallace in Paris on July 31, not until well after July 20. The salesman produced a copy of the sales contract as confirmation of the transaction.

■ In his first issue, Wallace challenges the sufficiency of the evidence to support his conviction, contending that "the State failed to show that the com-

---

1. The "Jennifer" named on the vehicle was      not Jennifer Mullins.

plaintant suffered a serious bodily injury." Wallace does not specify whether the challenge is to the legal sufficiency, the factual sufficiency, or both. We will consider both challenges in the interest of justice. *Aldrich v. State*, 928 S.W.2d 558, 559 n. 1 (Tex.Crim.App.1996); *Chimney v. State*, 6 S.W.3d 681, 688 (Tex.App.-Waco 1999, no pet.).

TEX. PEN.CODE ANN. § 22.02(a) (Vernon 1994) describes two kinds of aggravated assault: 1) assault, as defined in Section 22.01, which causes serious bodily injury to another, including the person's spouse; *or* 2) assault, as defined in Section 22.01, in which the defendant uses or exhibits a deadly weapon during the commission of the assault. Wallace was charged in the indictment with intentionally, knowingly, or recklessly causing bodily injury to Molaris by hitting him and using and exhibiting a deadly weapon, to-wit, a baseball bat, that in the manner of its use and intended use was capable of causing death and serious bodily injury. The jury was instructed:

> Our law provides that a person commits an assault if the person intentionally or knowingly or recklessly causes bodily injury to another.

> A person commits the offense of aggravated assault if the person commits assault, as hereinbefore defined, and the person uses or exhibits a deadly weapon during the commission of the assault.

> "Deadly weapon" means anything manifestly designed, made, or adapted for the purpose of inflicting death or serious bodily injury; or anything that in the manner of its use or intended use is capable of causing death or serious bodily injury.

> "Bodily injury" means physical pain, illness, or any impairment of physical condition.

The statutes do not require the State to prove both that Wallace caused serious bodily injury *and* that he used a deadly weapon. A person may be guilty of aggravated assault if he commits an assault with a deadly weapon and causes bodily injury *or* if he commits an assault and causes serious bodily injury. *Madden v. State*, 911 S.W.2d 236, 244 (Tex.App.-Waco 1995, pet. ref'd). Wallace was charged with the type of aggravated assault committed with the use of a deadly weapon, where the jury would have to find assault, bodily injury, and use of a deadly weapon, but not serious bodily injury. Since Wallace challenges the sufficiency of the evidence on a matter that the State was not required to prove, we reject his challenge.

■ In issues two and three, Wallace challenges the trial court's order of restitution to the victim in the amount of $6,227.65 for medical expenses and $3,000.00 for lost wages, totalling $9,227.65. *See generally* TEX.CODE CRIM. PROC. ANN. art. 42.037(b)(2)(A-C) (Vernon Supp.2002). Wallace contends that the trial court relied solely on hearsay evidence in issuing such an order, thereby denying him due process of law under both the United States and Texas Constitutions.

In its brief, the State has conceded error on this point, agreeing that the hearsay objection raised by Wallace at trial was well-taken. Thus, the only issue we consider is what disposition this error requires. The parties have called to our attention two cases procedurally similar to this case, in which the disposition was handled differently. In *Cartwright v. State*, 605 S.W.2d 287 (Tex.Crim.App. [Panel Op.] 1980), the trial court assessed punishment on an aggravated assault conviction at ten years, probated, and set restitution to the victim in the amount of $36,000.00. The only evidence regarding restitution in the record appeared in the presentence inves-

tigation (PSI) report, which the Court held was not a sufficient factual basis for the trial court to conclude that $36,000.00 would make the victim whole. Based on this finding, the Texas Court of Criminal Appeals abated the appeal and remanded the case to the trial court for a hearing to determine the just amount of restitution to be ordered. *Id.* at 289. On the other hand, in *Botello v. State*, 693 S.W.2d 528 (Tex.App.-Corpus Christi 1985, pet. ref'd), the trial court ordered the defendant to pay $2,101.20 in restitution. On appeal, the State conceded that the only evidence as to the proper amount of restitution was contained in the PSI report, admittedly hearsay and insufficient to support the trial court's determination. The State requested relief similar to that granted by the Texas Court of Criminal Appeals in *Cartwright*, i.e., abatement and remand to the trial court to hold another hearing. The defendant requested that the portion of the judgment containing the order of restitution be deleted from the judgment. The Corpus Christi court, after considering both arguments, decided to simply delete the restitution from the judgment, which they affirmed. We conclude that the better procedure to follow is to delete the restitution order from the judgment. *See Botello v. State*, 693 S.W.2d 528; *see also* Tex.Code Crim. Proc. Ann. art. 42.037(c)(2),(3) (Vernon Supp.2002).

█ In his fourth issue on appeal, Wallace argues that the lineup procedure used by the State was so suggestive it deprived him of his due process rights under the United States and Texas Constitutions. We find that this issue has not been properly preserved for appeal, and even if it had been preserved, Wallace has not shown that the in-court identification was so tainted by an impermissibly suggestive pretrial identification that it should have been excluded.

Sergeant Steven Holmes of the Paris police department was the investigating officer. He began his investigation by contacting the victim, who at first was unable to identify his attacker, but who did identify two females who were with the attacker, one of whom was Stansell. Holmes testified without objection that in his interview with Stansell, she said Smith was also with her and that Wallace was with them when they visited Bert Babb's mobile home on July 20. Holmes further testified, without objection, that Stansell told him Wallace attacked Molaris with a baseball bat. Holmes acknowledged that both Stansell and Smith at first gave him different stories in their statements, i.e., that someone named "Billy" was the perpetrator. He testified again, without objection, that it sounded to him like Stansell and Smith had "gotten together" before giving the "Billy" statement. Holmes testified he obtained a photographic lineup from the Lamar County sheriff's office, which he showed to the victim, to Stansell, Smith, and Melissa Layton and Meagan Streety, the two neighbors, and that all of these witnesses identified Wallace as being the man they saw at Babb's mobile home.

Holmes was later re-called to explain the procedure he used to prepare the photographic array that was displayed to the witnesses. Defense counsel questioned Holmes on voir dire regarding this procedure. The array was prepared specifically to include Wallace. Holmes later reiterated that he showed the array to the witnesses and they all identified Wallace. Defense counsel objected to the introduction of the photographic array, and the court overruled the objection.

Layton testified, without objection, that she had identified the person in one of the photographs as the person she saw at the mobile home on July 20. Also without objection, she identified Wallace as the

man she saw enter the mobile home on that date and come out carrying a baseball bat.

Streety testified, without objection, that she saw Stansell and "that guy" come out of the mobile home, and that the man was carrying a baseball bat. She viewed the photographic array she was shown by the police and identified the photograph in the top center as the man she saw. She further identified Wallace as the man she saw leaving the mobile home on July 20.

Stansell, who did not testify to viewing the photographic array, testified that she, Smith, and Mullins spent July 20 drinking and then, in the company of Wallace, went over to Babb's mobile home, where Wallace attacked Molaris with the bat. She also identified Wallace in court.

■■■ Generally, the defendant's attack is against an in-court identification as being tainted by an impermissibly suggestive pretrial identification procedure. This is done by a motion to suppress the identification, with the hearing held outside the jury's presence. *Barley v. State*, 906 S.W.2d 27, 32 (Tex.Crim.App.1995); *Martinez v. State*, 437 S.W.2d 842, 848 (Tex. Crim.App.1969); 7 MICHAEL J. McCORMICK, ET AL., TEXAS PRACTICE: CRIMINAL FORMS AND TRIAL MANUAL § 52.06 (10th ed.1995). At the very least, there should have been a trial objection to the in-court identification made by the witnesses who viewed the photographic array. The failure to complain about or object to in-court identifications constitutes a procedural default and waiver of any complaint on appeal. *In re G.A.T.*, 16 S.W.3d 818, 827 (Tex. App.-Houston [14th Dist.] 2000, pet. denied). In this case, defense counsel objected to the introduction of the photographic array, but did not move to suppress or in any fashion object to the in-court identifications made by witnesses who had viewed the array. An objection to the array does not pre-serve for appellate review any complaint regarding the in-court identification. Even if the issue raised had been properly preserved for appeal, the record shows no valid basis on which the trial court should have suppressed the in-court identifications made by witnesses who had viewed the photographic array.

■■■ In determining the admissibility of an in-court identification, we use a two-pronged inquiry. First, we determine whether the out-of-court identification procedure was impermissibly suggestive, and second, we determine whether that suggestive procedure gave rise to a substantial likelihood of irreparable misidentification. An analysis of these two steps requires us to examine the totality of the circumstances surrounding the particular case. *In re G.A.T.*, 16 S.W.3d at 827. Under the first step of the analysis, we note that a pretrial procedure may be suggestive, but yet not impermissibly suggestive. *Barley v. State*, 906 S.W.2d at 33; *In re G.A.T.*, 16 S.W.3d at 827. We have reviewed the record, as well as the photographic array, and we find nothing impermissibly suggestive about either the array itself or the officer's use of the array in the questioning of the witnesses.

■■■ Holmes asked the Lamar County sheriff's office to prepare a six-person photographic array, specifically to include Wallace and five similar individuals. In his brief, Wallace contends that error was committed because the photographic array did not contain anyone matching the original description given by the witnesses. We find no validity to this argument. During the discussion between counsel and the trial court concerning the admissibility of the photographic array, the prosecutor asserted without challenge that the array was prepared and shown to the witnesses after Wallace had been named as a sus-

pect. Given the state of the investigation at the time, there was no obligation to prepare a lineup fitting a description of someone not a suspect. Even assuming that Holmes used procedures that could be considered suggestive, we cannot find from the record that such a procedure would have made the witnesses' in-court identification less than reliable.

As the second step of the analysis, the Court of Criminal Appeals has mandated that five nonexclusive factors should be weighed against the corrupting effect of any suggestive identification procedure in assessing reliability under the totality of the circumstances:

1) the opportunity of the witness to view the accused at the time of the crime;

2) the witness' degree of attention;

3) the accuracy of the witness' prior description of the accused;

4) the level of certainty demonstrated by the witness at the confrontation; and

5) the length of time between the crime and the confrontation.

*Loserth v. State*, 963 S.W.2d 770, 772 (Tex. Crim.App.1998). We are required to review the trial court's findings on these factors, regarded as matters of historical fact, deferentially in the light most favorable to the trial court's ruling. These factors should then be weighed de novo against the corrupting effect of the suggestive pretrial identification procedure. When the trial court has not made express findings of historical fact, as is the case here, the facts are viewed in the light most favorable to the trial court's ruling.

The photographic array was shown to three witnesses: the victim, Molaris, and the two women who lived in a neighboring mobile home, Streety and Layton. Molaris was quite positive in his identification of Wallace; he had ample

opportunity to view his attacker during the attack, and his attention was certainly fixed on the person swinging the baseball bat. There is no evidence that Molaris was intoxicated or visually impaired at the time of the attack. Streety and Layton were likewise positive in their identifications. Their attention was focused on the arrival of the car with "Jennifer" stenciled on the window; they saw Wallace and two women enter Babb's mobile home, heard screams from inside, and saw Wallace leave holding a baseball bat. While there were some differences between the early descriptions given by these two witnesses and the physical appearance of Wallace, given the totality of the circumstances, we find no evidence that their in-court identifications of Wallace were tainted by an impermissibly suggestive pretrial identification.

We also note that Stansell positively identified Wallace in court as the individual who went with her to Babb's mobile home and who struck Molaris with the baseball bat. The record does not indicate that she ever viewed the photographic array, so her identification cannot be questioned on that basis.

Issues five and six challenge the trial court's refusal to give a jury instruction on self-defense. The trial court refused such an instruction for two stated reasons: the evidence did not support the charge and self-defense is inconsistent with Wallace's claimed alibi defense.

A person is justified in using force against another when and to the degree he reasonably believes the force is immediately necessary to protect himself against the other's use or attempted use of unlawful force. *Clifton v. State*, 21 S.W.3d 906, 907 (Tex.App.-Fort Worth 2000, pet. ref'd). If the evidence raises the issue of self-defense, the accused is entitled to have

an instruction on the defense submitted to the jury. *Riddle v. State*, 888 S.W.2d 1, 6 (Tex.Crim.App.1994); *Evans v. State*, 876 S.W.2d 459, 464 (Tex.App.-Texarkana 1994, no pet.). The defendant has the burden to come forward with such evidence, *Clifton v. State*, 21 S.W.3d at 907, but the defendant is not required to testify in order to be entitled to raise the defense. Self-defense may be raised by the testimony of other witnesses describing the circumstances of the offense. *Boget v. State*, 40 S.W.3d 624, 626 (Tex.App.-San Antonio 2001, pet. granted); *Evans v. State*, 876 S.W.2d at 464. If the defendant meets this burden of producing evidence, the right to the instruction inures to him regardless of whether the evidence is weak or strong, unimpeached or contradicted, and regardless of what the trial court may or may not think of the credibility of the testimony. However, if the evidence viewed in the light most favorable to the defendant does not establish self-defense, the defendant is not entitled to an instruction on the issue. *Clifton v. State*, 21 S.W.3d at 907. TEX. PEN.CODE ANN. § 9.31 (Vernon Supp.2002) controls in the issue of self-defense. *Evans v. State*, 876 S.W.2d at 464.

At trial Wallace relied on a defense of alibi.[2] In *Young v. State*, 991 S.W.2d 835 (Tex.Crim.App.1999), the appellant contended that his defense counsel was ineffective for failing to request an instruction on the defense of necessity.[3]

The Court of Criminal Appeals held that the defense counsel was not ineffective for such failure because, in order to raise the defense of necessity, the defendant must admit violating the statute under which he was charged, with necessity being offered as a justification that weighs against imposing punishment for the act that violated the statute. To raise necessity, the accused must admit that he committed the offense and then offer necessity as a justification. *Pennington v. State*, 54 S.W.3d 852 (Tex.App.-Fort Worth 2001, no pet.); *see also Aldrich v. State*, 53 S.W.3d 460 (Tex.App.-Dallas 2001, pet. granted); *McGarity v. State*, 5 S.W.3d 223 (Tex. App.-San Antonio 1999, no pet.). In *Anderson v. State*, 11 S.W.3d 369 (Tex. App.-Houston [1st Dist.] 2000, pet. ref'd), the court applied the rationale of *Young v. State*, 991 S.W.2d 835, to self-defense:

> Self-defense is justification for one's actions, which necessarily requires admission that the conduct occurred. Self-defense is inconsistent with a denial of the conduct. To raise the issue of self-defense, appellant must admit he committed the offense and then offer self-defense as a justification.

*Anderson v. State*, 11 S.W.3d at 372 (citations omitted)(citing *Young v. State*, 991 S.W.2d at 839). The court held that the trial court did not err in refusing the requested self-defense instruction.

---

**2.** "Alibi" is the presentation of evidence and argument that a defendant was not present at the scene of the crime to commit it. Alibi is not an affirmative defense for which a defendant has the burden of proof, but is simply the negation of the state's allegation that he did on a certain date and in a certain location, commit a certain crime. *Haliburton v. State*, 23 S.W.3d 192, 194 (Tex.App.-Waco 2000, pet. ref'd). Because alibi is not a statutory defense, affirmative defense, or justification found in Chapters 8 and 9 of the Penal Code,

the defense of alibi does not warrant a separate jury instruction. *Giesberg v. State*, 984 S.W.2d 245, 248–50 (Tex.Crim.App.1998). The statutory defense distinction is reserved for theories involving a defendant's admission that he or she committed the crime, but with explanation to justify a defendant's action or absolve a defendant of culpability. *Id.* at 248; TEX. PEN.CODE ANN. § 9.02 (Vernon 1994).

**3.** TEX PEN.CODE ANN. § 9.22 (Vernon 1994).

Self-defense is included in Chapter 9 of the Penal Code, entitled "Justification Excluding Criminal Responsibility," along with necessity, public duty, and protection of life and health. TEX. PEN.CODE ANN. § 9.01, et seq. (Vernon 1994 & Supp. 2002). Consistent with the statutory language and the cases cited, we hold that because Wallace's defense was alibi, and because he did not admit the act but contended he was not even present when it was committed, he was not entitled to a self-defense instruction.[4]

Issues seven and eight concern Wallace's motion for new trial. He contends that 1) the trial court erred in failing to hold a hearing on his motion, and 2) the trial court abused its discretion in overruling the motion. The motion for new trial alleges that 1) the verdict is contrary to the law and the evidence, and 2) two witnesses have come forward after the trial who state that the assailant in this case was a man named Billy Ray Williams, not Wallace.

■ The granting or denying of a motion for new trial lies within the discretion of the trial court. We may not substitute our judgment for that of the trial court, but rather we may only decide whether the trial court's decision was arbitrary or unreasonable. *Lewis v. State*, 911 S.W.2d 1, 7 (Tex.Crim.App.1995). To obtain a new trial based on newly discovered evidence, a defendant must show that: 1) the newly discovered evidence was unknown to him at the time of trial; 2) his failure to discover the evidence was not due to his lack of due diligence; 3) the evidence is probably true and would bring about a different result in another trial; and 4) the evidence is admissible and not merely cumulative, corroborative, collateral, or impeaching. *Manley v. State*, 28

S.W.3d 170, 173 (Tex.App.-Texarkana 2000, pet. ref'd); *Dotson v. State*, 28 S.W.3d 53, 55 (Tex.App.-Texarkana 2000, pet. ref'd).

■ Regarding these requirements, Wallace's motion implies, but certainly does not specifically state, that the evidence was unknown to him at the time of trial and that the failure to discover the evidence was not due to a lack of diligence. The motion states that the witnesses came forward after an article regarding the case appeared in the Paris newspaper. If we assume (and the motion does not state) that the witnesses were unknown to Wallace at the time of trial, and if we assume (but the motion does not state) that the newspaper article appeared at a time too late for Wallace to call the two affiants as witnesses, Wallace's motion would meet the first two criteria for newly discovered evidence. However, the affidavit of Donna S. Marshall does not state that Williams told her that he, not Wallace, was the assailant, and the affidavit does not give any details of the criminal incident in question. Based on Marshall's affidavit, even if it is true, we cannot conclude that a different outcome in the trial would result based on her testimony. Instead, Marshall's evidence is merely impeaching evidence, which would at best only serve to cast suspicion on someone other than Wallace as the guilty party. *Compare Manley v. State*, 28 S.W.3d at 173–74. Teresa Ashford's affidavit merely states that Williams had beaten up, and in one case set on fire, several people in the past. This affidavit, like that of Marshall's, contains no evidence that Williams confessed to the crime and contains no statement that the affiant has any personal knowledge about the

---

4. *But see Booth v. State,* 679 S.W.2d 498, 501 (Tex.Crim.App.1984), which held that incon-

sistent or even contradictory defenses are matters for the *jury* to decide.

crime or about any connection Williams may have had to it.

The two affidavits supporting Wallace's motion are as follows:

1. Donna Marshall's affidavit:

I talked to Billy Ray Williams around April 1, 2001 after finding out Robert Wallace had been convicted on assault charges. *It was rumored Billy had committed this crime.* We are real good friends, so I wanted to ask him about it. He came over [sic] my house & after about an hour of conversation, I brought up the subject. *In the begining [sic] he said he didn't do it* & then began talking about whether he would get time for something like that or could it be probated. I kept talking & then *he kept saying why did Amy & Jenny make statements.* We argued back & forth because as far as I knew Jenny was never there. No one had ever mentioned Jenny & he just kept saying they would be taken care of. We continued conversation [sic] he was asking why would Sabra say Bobby did it. He also mentioned moving to Annona right after this incident & came back right after this conviction. In July he had moved back from living in Ft. Worth with a woman named Teresa.

Billy has a history of violence against other [sic]. A few years ago he set Janie Clemenske on fire for sleeping in his bed. I have also witnessed attacks on Brian Shughart & a man named Guye. He has beaten an ex named Teresa & Jessica Brooks. He had tried to cut his own throat one night when we were drinking. Three of us held him down and he was bleeding.

On Sunday, April 22nd, 2001 he came back over & was saying he called the lawyer in Ft. Worth who did the assault case on Teresa & asked if he confessed to this would he see time. The lawyer said he would go to jail & advised against it. He also reinforced that Amy, Sabra & Jenny he could take care of. (*Emphasis added.*)

2. Teresa Ashford's affidavit:

My name is Teresa Ashford. I formly (sic) lived with Billy Ray Williams. Around a 1 yr [sic] ago I seen him beat up a man named Stanley Millery in our home which resulted in Stanley's jaw being broke 3 times in 3 different places. And he was in the hospital for 2 days.

He is proned [sic] to violence and has physically beat me numerous of times in the past.

He has also beat Brian Vaughn on his front porch with a baseball bat. He had told me about a time when he had set a man on fire with lighter fluid for sleeping in his bed.

On one occasion we were awoke by some friends that were being followed, Billy Ray went outside and the guy got out of the pickup with a baseball-bat he swung at Billy Ray and Billy Ray took the bat away from him and busted his windshield.

The attempt to place the blame on Williams began immediately after the assault when Stansell and Smith gave statements to the police that they were present and that a man named "Billy" was the assailant. Later, however, these two witnesses gave second statements to the police saying that Wallace was the assailant. Stansell and Smith said they gave false statements, at first blaming Billy for the assault because they were trying to protect Wallace. They later decided it was not right to do that, and they also realized that the police would find out about it and they would get in trouble, so they changed their statements and told police, and testified positively at trial, that Wallace was the assailant.

■ The affidavits submitted by Wallace do not meet the requirements for the post-trial admission of newly discovered evidence. Motions for new trial based on newly discovered evidence are not favored by the courts and are viewed with great caution. *Drew v. State,* 743 S.W.2d 207, 225 (Tex.Crim.App.1987); *Manley v. State,* 28 S.W.3d at 173; *Dotson v. State,* 28 S.W.3d at 55. The statements and information in the affidavits are not sufficiently definite to indicate that a different result would have occurred if the affiants' statements were admitted into evidence at a new trial; the evidence referred to in the affidavits is merely impeaching and is cumulative of evidence admitted at trial attempting to place the blame on Williams; and the plot to blame Williams was fully explored and exposed at trial. It may be inferred from all the evidence that, even if Williams made the statements described in Marshall's affidavit, he had heard about the plot to blame him for the assault and was simply speculating about what might happen if he were charged with the assault. Marshall's affidavit states that it was rumored that Williams committed the assault and that he at first denied it. He never retracted his denial, but only speculated about what might happen to him if he was charged with the crime. Moreover, the evidence that Wallace was the attacker is overwhelming, seven witnesses having positively identified him as the assailant. No witness testified that Williams committed the assault. In view of these circumstances, the trial court did not abuse its discretion in refusing to hold a hearing on Wallace's motion or in failing to grant it.

In issues nine and ten, Wallace contends he received ineffective assistance of counsel at trial, in violation of his rights under the United States and Texas Constitutions.

■ We apply the standard of review for such claims set out by the United States Supreme Court in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and by the Texas Court of Criminal Appeals in *Hernandez v. State,* 726 S.W.2d 53 (Tex.Crim.App.1986). The standard of review has two prongs. Under the first prong, the accused must show that counsel's performance was deficient. To show deficient performance, the defendant must show that counsel's representation fell below an objective standard of reasonableness. Under the second prong, an appellant must show that the deficient performance prejudiced the defense. To show prejudice, the defendant must show a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Our review of defense counsel's representation is highly deferential. We indulge a strong presumption that counsel's actions fell within a wide range of reasonably professional assistance. Wallace must overcome the presumption that under the circumstances, counsel's actions might be considered sound trial strategy. *Chambers v. State,* 903 S.W.2d 21, 32–33 (Tex.Crim.App.1995).

■ Rarely will a reviewing court be afforded, on a direct appeal, the opportunity to make a determination regarding ineffective assistance of counsel. Any allegation of ineffective assistance must be firmly grounded in the record, and the record on direct appeal generally does not contain an adequate inquiry into possible tactical decisions made by trial counsel. *See Thompson v. State,* 9 S.W.3d 808, 813–14 nn. 5–6 (Tex.Crim.App.1999). Supplementation of the record for establishing ineffective assistance may be accomplished through a motion for new trial and a hearing thereon. *Reyes v. State,* 849 S.W.2d 812, 815 (Tex.Crim.App.1993). Although a motion for new trial was filed in this case,

the motion made no allegation of ineffective assistance of counsel.

■■■ Wallace particularly criticizes trial counsel for permitting the two investigating police officers, Detective Steven Holmes and Patrolman David Wolf, to testify to the contents of the statements given to them by Stansell, Smith, Babb, Merritt, Streety, and Layton. He argues that much of this testimony is inadmissible hearsay and speculation. While we have no record showing what strategy counsel was pursuing, we find a reasonable strategy, as revealed in counsel's closing argument, for permitting this testimony to be admitted without objection. In his jury summation, defense counsel tried to convince the jurors that the State's witnesses, particularly Stansell and Smith, were not to be believed because they had changed their stories from the original ones they gave to the police, particularly the description of the attacker as being a tall, blond male, dissimilar to Wallace. The only way to demonstrate the variances and to attempt to convince the jury that these witnesses should not be believed, was to allow all statements they had made to be admitted into evidence, even though it was hearsay testimony of the police officers. This was the only way the contents of these statements could be brought to the jury's attention and possibly demonstrate the unreliability of the witnesses. Had the contents of the statements been objected to and not allowed into evidence, the jury would never have known of the substantial variances in the witnesses' stories over time. In addition, Wallace does not demonstrate that there is a reasonable probability that, but for counsel permitting this evidence before the jury, the result would have been different.

■■■ Permitting otherwise objectionable testimony to come into evidence without objection is not per se ineffective assistance. Where a valid trial strategy, or a feasible trial strategy in the absence of record evidence, is the basis for such inaction by defense counsel, an appellant has not demonstrated ineffective assistance of counsel. See Burruss v. State, 20 S.W.3d 179, 188 (Tex.App.-Texarkana 2000, pet. ref'd); Young v. State, 10 S.W.3d 705, 712–13 (Tex.App.-Texarkana 1999, pet. ref'd).

For the reasons stated, we affirm the judgment.

Partial Dissenting Opinion by Justice GRANT.

GRANT, Justice, dissenting.

Robert Wallace raised an issue contending that he was entitled to an evidentiary hearing on his Motion for New Trial. The majority opinion does not address this matter, but rather addresses whether he is entitled to a new trial.

Counsel duly requested a hearing on the Motion for New Trial. The record indicates that no evidentiary hearing was held and the Motion for New Trial was overruled.

The defendant need only assert reasonable grounds for relief that are not determinable from the record in order to be entitled to a hearing. The purpose of the hearing is to fully develop the issues raised in the motion. Reyes v. State, 849 S.W.2d 812, 816 (Tex.Crim.App.1993).

Prior to the trial, two of the trial witnesses had stated that "Billy" had committed the assault in question, but they later changed their stories to say that Wallace had committed the assault. The affidavit of Donna Marshall states that Billy Ray Williams had told her that he had called an attorney in Fort Worth to determine whether he would "get jail time" if he confessed, and he stated that the lawyer

had stated he would go to jail and advised against confessing. Although this is not a direct admission by Williams that he had committed the assault in question, it raises a strong inference.

The affidavit clearly shows that this statement was made to Marshall after Wallace had been convicted on the assault charges. She further stated Williams had told her he had moved to another town right after this incident had occurred and had come back right after the conviction of Wallace.

This affidavit was sufficient to raise facts which would entitle Wallace to an evidentiary hearing on his Motion for New Trial.

I would abate this case and remand it to the trial court for an evidentiary hearing on the Motion for New Trial.