

In The
Court of Appeals
Sixth Appellate District of Texas at Texarkana

_____

No. 06-12-00035-CR
_____


RONNIE CHARLES BAYLOR, JR., Appellant

V.

THE STATE OF TEXAS, Appellee



On Appeal from the 354th Judicial District Court
Hunt County, Texas
Trial Court No. 26920



Before Morriss, C.J., Carter and Moseley, JJ.
Memorandum Opinion by Justice Moseley

MEMORANDUM OPINION

After having been convicted by a jury for aggravated assault of Louis Tubbs with a deadly weapon and having been sentenced to fifteen years' imprisonment, Ronnie Charles Baylor, Jr., has filed an appeal. Baylor raises three points on appeal: (1) he denies that the evidence was legally sufficient to support the judgment; (2) he posits that he received ineffective assistance of counsel; and (3) he alleges that "because evidence was admitted that was not provided to trial counsel in discovery, trial counsel was unfairly surprised."

The incident giving rise to the charges against Baylor occurred at Baylor's home. Richard Garcia, Baylor's neighbor, testified that he was standing outside his own home when he observed Tubbs and his friend, Anthony Duckett, arrive in a car at the front of Baylor's residence. Garcia watched as "[a]ll three walked to the backyard,"[1] after which Garcia heard the report of a gunshot. Immediately after the gunshot, Tubbs, who had been shot in the "leg and kneecap," ran into Garcia's house and yelled for Garcia to call the emergency 9-1-1 hotline. Garcia noticed that Baylor was "just kind of waiving [sic] his hands" in a manner suggesting to Garcia not to call the police. Despite Baylor's protest, Garcia placed the emergency call.

Tubbs testified that he was with Duckett when "[t]he guy that shot me just popped up." Tubbs made an in-court identification of Baylor as the shooter. Although he was unable to identify Baylor from a photographic lineup,[2] Tubbs recognized Baylor after "[a] girl showed [pictures] to me on a computer because he was going around saying that -- you know, bragging

[1]Tubbs admitted that he was a drug dealer. No narcotics were found at the scene.

[2]Tubbs stated that the picture in the photographic lineup did not look like Baylor.

2

about it or whatever and I remembered him and the little haircut he had at the time, I remembered it." At trial, Tubbs remembered that the shooter was wearing "red shorts, a white T-shirt, and a red rag on his head."[3] This description matched the clothing Baylor wore at the time of his arrest.

Tubbs, who told the jury that he did not know Baylor at the time of the shooting, testified that nothing was said as Baylor "popped up with the gun and . . . loaded it and shot me." Duckett was Baylor's brother-in-law. Delvin Sharé Duckett (Duckett's wife and Baylor's sister) testified that she had known Tubbs for twelve years and that Tubbs met Baylor on many occasions and knew him. Duckett testified that his "homeboy" Tubbs was shot in Baylor's backyard, but that there was no way Baylor could have shot him. Tubbs told the jury that he had spoken to Baylor the day before trial and that Baylor had then "called me a snitch and [was] making little threats to me, playing stare wars."

Officer Mike Johnston suspected Baylor after speaking to witnesses at the scene. A search of Baylor's home uncovered a "9mm" "shell casing and some other evidence that made it appear that's where it occurred." Baylor had retreated inside his home and initially refused to come outside to speak with Johnston. When he agreed to speak with officers outside, he told them that "[h]e was inside; and he said he didn't hear anything, see anything, didn't know what happened." A gun was found "in the refrigerator just sitting on a shelf in there," along with

---

[3]According to a police report, Tubbs had "described the person who shot him as a black male in his early 20's wearing a white shirt, blue jeans, and a black and red cap." However, Detective Jamie Fuller testified that Tubbs told her that the shooter was wearing "red shorts, a white shirt with red writing on it," and "a red skull cap." Exhibits admitted at trial clarified that Baylor was wearing "Red Dickies jean shorts," a white, ribbed undershirt, a white shirt with red designs, and a red "do-rag."

boxes of "Independence" brand and "Wolf Ammo" brand "9mm ammunition." The gun was a "Masterpiece 9mm weapon," serial number B1224, belonging to Baylor.

Baylor was arrested, and his hands were tested for gunpowder residue.[4] Detective Jamie Fuller testified that Baylor "kept trying to rub his hands around and ball up his fists" during the gunshot residue test and that he offered an explanation that he had been "shooting off fireworks." Officer Richard M. Clark testified that after his arrest, Baylor yelled to Duckett, "Don't do it, you'll be a rat; and he repeated this several times." Fuller went to the hospital to speak with Tubbs. She deduced that Tubbs "knew who shot him and he didn't want to tell." Firearm and tool mark examiner Amanda Harvey-Schreiner testified that the "fired cartridge case with 'BLAZER 9mm LUGER' headstamp" was fired from Baylor's "Masterpiece . . . 9mm Luger caliber semiautomatic pistol, serial number B1224."

The evidence showed that only three people had been in Baylor's yard when the shooting occurred—Baylor, the victim, and Baylor's brother-in-law. After the shooting occurred, Baylor attempted to dissuade Garcia from calling for emergency assistance and then retreated into his home when police arrived, telling the investigating officers that he was inside the house when the shooting occurred. He underwent the gunpowder residue test reluctantly, volunteering an alternative explanation for why his hands might contain gunpowder residue. As he was being arrested, Baylor warned Tubbs not to become a "rat." Baylor's gun was found inside his refrigerator, an unlikely place for the everyday storage of a firearm, and it was discovered that

---

[4]The test kit was never sent to the laboratory.

4

the discharged cartridge case found in the backyard had been fired by that gun. Most importantly, Tubbs identified Baylor as the shooter.[5]

We affirm the trial court's judgment, concluding that the evidence was legally sufficient, that counsel provided effective assistance, and that the issue of unfair surprise was waived.

## I. Sufficiency of the Evidence to Support Baylor's Conviction

### A. Standard of Review

In evaluating legal sufficiency, we review all of the evidence in the light most favorable to the jury's verdict to determine whether any rational jury could have found the essential elements of aggravated assault with a deadly weapon beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *Hartsfield v. State*, 305 S.W.3d 859, 863 (Tex. App.—Texarkana 2010, pet. ref'd) (citing *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007)). Our rigorous legal sufficiency review focuses on the quality of the evidence presented. *Brooks*, 323 S.W.3d at 917–18 (Cochran, J., concurring). We examine legal sufficiency under the direction of the *Brooks* opinion, while giving deference to the responsibility of the jury "to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19).

---

[5]Baylor attempts to discredit Tubbs' in-court identification by highlighting that Tubbs was unable to make a prior identification of Baylor as the shooter. These are attacks on Tubbs' credibility. Further, there was evidence that Tubbs knew that Baylor was the shooter, but that he did not want to reveal the information due to Baylor's relationship with Duckett.

5

Legal sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). The hypothetically correct jury charge "sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id.*

Baylor committed the offense of aggravated assault if he intentionally or knowingly caused bodily injury to Tubbs[6] and used or exhibited a deadly weapon during the commission of the assault. TEX. PENAL CODE ANN. §§ 22.01(a)(1), 22.02(a)(2) (West 2011). A deadly weapon is "anything that in the manner of its use or intended use is capable of causing death or serious bodily injury." TEX. PENAL CODE ANN. § 1.07(a)(17)(B) (West Supp. 2012). The only element challenged on appeal is the sufficiency of the proof that Baylor was the person who shot Tubbs.

### B. Analysis of the Evidence

It is not necessary to reiterate the evidence set out above. A rational jury could have found, beyond a reasonable doubt, that Baylor shot Tubbs.

We find the evidence legally sufficient to support Baylor's conviction. This point of error is overruled.

---

[6]The indictment in this case read that Baylor "did then and there intentionally or knowingly cause bodily injury to LOUIS TUBBS by shooting him with a firearm, and the defendant did then and there use or exhibit a deadly weapon, to wit: a firearm, during the commission of the assault."

## II. Baylor's Claims of Surprise at Trial Were Waived

In an unrelated case, Melvin O. Mapps was arrested in Greenville, Texas, more than a month before the shooting for which Baylor was charged. Officers arresting Mapps confiscated a gun from him which belonged to Baylor. Baylor filed a "motion to return property" in that case, alleging that the "Masterpiece Arms, 9MM pistol Serial Number B1224" belonged to him and attached a copy of the receipt for its purchase to the motion. The judge presiding over the Mapps case granted Baylor's motion and signed an order releasing the firearm to Baylor. The State sought to introduce this order.

Baylor's attorney made the following objection:

> MR. SHELTON: Your Honor, I received a call from the State's attorney at approximately 6:00 o'clock last night informing me . . . [of] additional pieces of evidence that they were going to admit that they had recently discovered. I'm objecting to that being admitted.
>
> No. 1, I did file an omnibus pretrial motion that included discovery requests. It was not in the discovery packet. It does, I believe, go to my tactics in this case; and also, I'm arguing a complete surprise.
>
> . . . .
>
> . . . . Basically, it ties Mr[.] -- it further attempts to tie Mr. Baylor to the firearm that allegedly was used in the assault.

The prosecutor responded:

> Specifically, I got a call from Detective Fuller around 4:30 yesterday afternoon. She's not even the lead investigator on the case.
>
> In that conversation she informed me that there is a public record that is available to the defense. It's not in the State's possession. It's one of the two documents Mr. Shelton is referring to. It's a court order signed by Judge Joe Leonard that released the firearm to this Defendant two months before this shooting. The only reason she had it is because she knew there was that order in another file. It wasn't even in this file.

> So my argument would be that; first, it wouldn't be [a] surprise because his client would, obviously, know that he had an order releasing the gun to him; 2, it's not in the State's possession so he had access to it. It's -- he can get it in the clerk's office.

The prosecutor argued that because Baylor was required to be present in person and show his driver's license to the judge presiding over the Mapps case in order "to take possession of the gun," he would have necessarily been aware of the entry of the order and could not be unfairly surprised by the discovery of this information.[7] After looking at the Mapps file, the trial court overruled Baylor's objection to the admission of the order, reasoning that it was public record and that Baylor was aware of the existence of the order.

Although Baylor made the claim that the presentation of the order effected a surprise, he failed to request a continuance in order to prepare for an attempt at its revelation.[8] "It is well settled that the proper procedure when alleging surprise due to violation of a trial court's order for discovery is to object or ask for a postponement or continuance of the trial." *Duff–Smith v. State*, 685 S.W.2d 26, 33 (Tex. Crim. App. 1985). Failure to do so results in a waiver of any error based on surprise or violation of a discovery order. *Smith v. State*, 779 S.W.2d 417, 431 (Tex. Crim. App. 1989); *Duff-Smith*, 685 S.W.2d at 33; *McQueen v. State*, 984 S.W.2d 712, 718 (Tex. App.—Texarkana 1998, no pet.) (citing *Lindley v. State*, 635 S.W.2d 541, 544 (Tex. Crim. App. [Panel Op.] 1982)); *see Hall v. State*, 283 S.W.3d 137, 169 (Tex. App.—Austin 2009, pet.

---

[7]For the first time on appeal, there is a suggestion that the gun might have belonged to Baylor's father, since "Appellant is Ronnie Charles Baylor, *Jr.*" As pointed out below, Baylor admitted that the gun was his.

[8]Baylor's brief recited that "[w]hen the trial court admits evidence offered by the State that was not produced in compliance with a discovery order, the inquiry is whether the prosecutor acted with the specific intent to willfully disobey the discovery order by failing to turn over the evidence." However, Baylor admits that "[i]t does not appear from the record that [the prosecutor] acted willfully, or that the court abused its discretion." We agree.

ref'd); *Williams v. State*, 995 S.W.2d 754, 762 (Tex. App.—San Antonio 1999, no pet.). Because Baylor did not request a continuance, any alleged error was waived.

Further, the record establishes a lack of surprise based upon Baylor's own admission.[9] At a previous bond hearing, Baylor's attorney stated, "My client's involved in it because the gun that was used in the shooting was found in the freezer which he owns. He owns the gun." Then, counsel engaged in the following exchange with Baylor:

> [Defense Counsel]: Did you have anything to do with that shooting?
>
> [Baylor]: No.
>
> [Defense Counsel]: All right. Now, the problem is, the gun that was shot was found in a freezer; is that correct?
>
> [Baylor]: Correct.
>
> [Defense Counsel]: And you're admitting that's your gun.
>
> [Baylor]: Yes, sir.
>
> [Defense Counsel]: All right.
>
> MS. AIKEN: And Mr. Tay -- Mr. Baylor, it's a 9 millimeter; is that correct?
>
> [Baylor]: Yes, ma'am.

---

[9]Typically, a trial court's decision to admit or exclude evidence is reviewed under an abuse of discretion standard. *McDonald v. State*, 179 S.W.3d 571, 576 (Tex. Crim. App. 2005); *Willover v. State*, 70 S.W.3d 841, 845 (Tex. Crim. App. 2002). A trial court does not abuse its discretion so long as the decision to admit evidence is within the "zone of reasonable disagreement." *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1990) (op. on reh'g). If the trial court's decision on the admission of evidence is supported by the record, there is no abuse of discretion, and the trial court will not be reversed. *Osbourn v. State*, 92 S.W.3d 531, 537 (Tex. Crim. App. 2002).

Since the effect of the evidence of Baylor's attempt to regain the gun after it had been taken from Mapps did nothing more than add further proof of ownership of the gun which Baylor acknowledged that he owned, that evidence should constitute no unfair surprise.

We overrule the point of error complaining of unfair surprise.

## III. Baylor Cannot Meet His Burden to Prove Ineffective Assistance of Counsel

Baylor filed a generalized motion for new trial and attached his affidavit complaining that he believed his trial counsel was unprepared and that he failed to admit certain evidence, subpoena witnesses, or allow Baylor to testify that another person shot Tubbs because Tubbs allegedly cheated the person "out of $9,000 worth [of] drugs." Baylor's attorney filed an affidavit claiming that he was surprised by the motion to return property and that he had to readjust his trial strategy. No further explanation of counsel's trial strategy was given. The motion for new trial was denied.

On appeal, Baylor more specifically alleges that his counsel was ineffective because: "he was not prepared for trial"; there was no "Challenge to Impermissibly Suggestive Pretrial Identification"; "counsel should have objected at trial [to] . . . Detective Johnston['s testimony] regarding eyewitness identification"; "he did not follow up questioning Fuller about her not submitting" the gunshot residue or DNA tests; he "Inadequate[ly] Impeach[ed] . . . Eyewitness Identification Evidence"; and did not allow Baylor to testify on his own behalf.

### A. Standard of Review

Any allegation of ineffectiveness of counsel must be firmly founded in the record. *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005); *Thompson v. State*, 9 S.W.3d

10

808, 813 (Tex. Crim. App. 1999); *Wallace v. State*, 75 S.W.3d 576, 589 (Tex. App.—Texarkana 2002), *aff'd*, 106 S.W.3d 103 (Tex. Crim. App. 2003). From the record received by this Court, which does not include counsel's reasoning for the complained-of actions, Baylor bears the burden of proving that counsel was ineffective by a preponderance of the evidence. *Goodspeed*, 187 S.W.3d at 392; *Thompson*, 9 S.W.3d at 813; *Cannon v. State*, 668 S.W.2d 401, 403 (Tex. Crim. App. 1984).

We apply the two-pronged *Strickland* test handed down by the United States Supreme Court to analyze Baylor's ineffective assistance of counsel claims. *Hill v. Lockhart*, 474 U.S. 52, 57 (1985); *Strickland v. Washington*, 466 U.S. 668 (1984). First, Baylor must show that counsel's performance fell below an objective standard of reasonableness in light of prevailing professional norms. *Strickland*, 466 U.S. at 687–88. There is a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance and that the challenged action could be considered sound trial strategy. *Id.* at 689; *Ex parte White*, 160 S.W.3d 46, 51 (Tex. Crim. App. 2004); *Tong v. State*, 25 S.W.3d 707, 712 (Tex. Crim. App. 2000). Therefore, we will not second-guess the strategy of Baylor's counsel at trial through hindsight. *Blott v. State*, 588 S.W.2d 588, 592 (Tex. Crim. App. 1979); *Hall v. State*, 161 S.W.3d 142, 152 (Tex. App.—Texarkana 2005, pet. ref'd).

The second *Strickland* prejudice prong requires a showing that but for counsel's unprofessional error, there is a reasonable probability that the result of the proceeding would have been different. *Strickland*, 466 U.S. at 687–88. Failure to satisfy either prong of the *Strickland* test is fatal. *Ex parte Martinez*, 195 S.W.3d 713, 730 n.14 (Tex. Crim. App.

11

2006). Thus, we need not examine both *Strickland* prongs if one cannot be met. *Strickland*, 466 U.S. at 697.

Because Baylor's challenge was made to the trial court in a motion for new trial, we analyze the ineffective assistance claim as a challenge to the denial of his motion for new trial. *Charles v. State*, 146 S.W.3d 204, 208–10 (Tex. Crim. App. 2004), *superseded by rule on other grounds by State v. Herndon*, 215 S.W.3d 901 (Tex. Crim. App. 2007); *Shanklin v. State*, 190 S.W.3d 154, 158 (Tex. App.—Houston [1st Dist.] 2005), *pet. dism'd*, 211 S.W.3d 315 (Tex. Crim. App. 2007); *State v. Kelley*, 20 S.W.3d 147, 151 (Tex. App.—Texarkana 2000, no pet.). Therefore, we review the *Strickland* test through an abuse of discretion standard, and reverse only if the trial court's decision is arbitrary or unreasonable, viewing the evidence in the light most favorable to the ruling. *Shanklin*, 190 S.W.3d at 158–59; *Kelley*, 20 S.W.3d at 151. A trial court abuses its discretion in denying a motion for new trial only when no reasonable view of the record could support the trial court's ruling. *Charles*, 146 S.W.3d at 208.

### B. Analysis

Baylor believes that counsel "was deficient because he neglected to investigate all evidence and adequately prepare for trial." He argues that counsel "should have challenged any in-court identification" by Tubbs because "[a]n in-court identification is inadmissible when it has been tainted by an impermissibly-suggestive pretrial photographic identification." Tubbs did not identify Baylor from the photographic lineup; rather, he claimed that he recognized Baylor in other photographs "a girl had shown" him, which were not included in the record. Instead of seeking to suppress the identification, counsel chose to cross-examine Tubbs to call into question

12

his credibility. Absent counsel's reasoning, we surmise that counsel was aware that "[t]he test is whether, considering the totality of the circumstances, 'the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.'" *Loserth v. State*, 963 S.W.2d 770, 772 (Tex. Crim. App. 1998). We can also determine that he was aware of the rule that if no substantial likelihood of misidentification is shown despite a suggestive pretrial procedure, subsequent identification testimony will be deemed reliable. *Id.* Therefore, counsel could have determined that the identification would be admissible because there was evidence from several sources that Tubbs knew Baylor, Fuller's testimony that Tubbs knew who shot him, but did not want to tell, and evidence that Baylor warned Tubbs not to "snitch." In other words, counsel could have reasoned that the second group of photographs would not have given rise to misidentification of a person Tubbs knew.

Baylor also believed that counsel should have objected to Johnston's expert testimony explaining that Tubbs might not have been able to identify Baylor from the photographic lineup because based on Johnston's experience, people might not look the same in a photographic lineup as they do in person. Where an appellate record is silent as to why trial counsel failed to take certain actions, the appellant has failed to rebut the presumption that the decision was in some way reasonable. *See Mata v. State*, 226 S.W.3d 425, 431 (Tex. Crim. App. 2007). It is plausible that counsel did not object because he believed Johnston was testifying as a lay person based upon his experience, or that the State's response to the objection could have highlighted Tubbs' testimony that Baylor looked different in the photographic lineup, lending more credibility to the in-court identification. Baylor also complains that counsel should have

13

consulted with and had "an eyewitness expert witness to testify regarding memory processes that occur and factors that affect the reliability of eyewitnesses."[10]  Counsel could have decided it was unnecessary to take that step given Tubbs' in-court identification, the evidence suggesting that Tubbs knew Baylor well, and Garcia's testimony that Baylor attempted to instruct Garcia not to dial 9-1-1.

Baylor next argues that counsel should have emphasized Tubbs' statements in the hospital that he did not really see the shooter,[11] could not remember whether the shooter was wearing a black hat, and that he "'fibbed' to Detective Fuller about his criminal history." However, counsel cross-examined Tubbs regarding his statements to officers describing the shooter's attire and discussed Tubbs' criminal history at length, including the prevarication to Fuller.  It is possible that counsel did not want to continue discussing Tubbs' statement that he did not see the shooter because it could emphasize Tubbs' testimony during direct examination that he saw Baylor at the hospital and recognized him as the shooter.  Counsel could have also feared that Tubbs would admit that he knew that Baylor shot him all along, but remained silent out of fear.  Further, counsel did emphasize during closing arguments Tubbs' initial statements that he did not see the shooter, the allegedly inconsistent statements of the shooter's attire, and the lie about his criminal record to officers.

---

[10]Counsel's failure to call a witness is irrelevant absent a showing that the purported witness was available and that their testimony would have benefitted the appellant. *King v. State*, 649 S.W.2d 42, 44 (Tex. Crim. App. 1983).

[11]Baylor also complains about counsel's failure to admit recorded statements by Tubbs obtained during discovery. As the State points out, the substance of these statements are not included in the record.  We may assume failure to present evidence was due to any strategic motivation that can be imagined, including the possibility that no favorable evidence could be presented. *Mata v. State*, 226 S.W.3d 425, 431 (Tex. Crim. App. 2007); *Garcia v. State*, 57 S.W.3d 436, 441 (Tex. Crim. App. 2001); *Fox v. State*, 175 S.W.3d 475, 485–86 (Tex. App.—Texarkana 2005, pet. ref'd).

14

Baylor next complains that although counsel "did cross-examine Detective Fuller regarding Gunshot Residue Testing . . . he did not follow up questioning Fuller about her not submitting the [gunshot residue kit] or DNA for testing." The decision not to cross-examine a witness is most often considered a matter of trial strategy developed as a "result of wisdom acquired by experience in the combat of trial." *Ex parte McFarland*, 163 S.W.3d 743, 756 (Tex. Crim. App. 2005) (quoting *Coble v. State*, 501 S.W.2d 344, 346 (Tex. Crim. App. 1973)); *Miniel v. State*, 831 S.W.2d 310, 324 (Tex. Crim. App. 1992); *Smith v. State*, 968 S.W.2d 490, 491 (Tex. App.—Texarkana 1998, no pet.). It will not prove ineffective assistance, particularly when the "[a]ppellant fails to show what could have been achieved by further cross-examination." *Matthews v. State*, 830 S.W.2d 342, 347 (Tex. App.—Houston [14th Dist.] 1992, no pet.). It was well within the realm of sound trial strategy for Baylor's counsel to decide not to further cross-examine Fuller, considering that he had already established that the testing was not done.[12] A failure to beat a dead horse will not be seen as ineffective assistance.

Finally, Baylor contends that counsel rendered ineffective assistance because he (Baylor) was not allowed by trial counsel to testify in his own behalf. Baylor claims in his post-trial affidavit that he wanted to testify that either "Jamail Lucas or Shemail Lucas shot Tubbs because Tubbs owed money for drugs," but that counsel did not allow him to do so. There is nothing in the record, aside from Baylor's post-trial affidavit, which the court was free to reject, suggesting that counsel prevented Baylor from testifying. Instead, the record shows that counsel advised

---

[12]Baylor argues that counsel should have played a video recording of Baylor's backyard that was admitted into evidence. The jury was encouraged to view this recording during its deliberation.

Baylor not to testify and that Baylor agreed with counsel's recommendation. During voir dire, Baylor's counsel stated,

> I cannot prohibit a defendant from taking the stand. That's their absolute right under the law; but as Mr. Baylor's counsel, I recommended to him – and he's been one of my smarter clients. He sort of listens to me. I have clients that don't listen to me; and usually, when they don't listen to me, they get themselves in more trouble. But Mr. Baylor has listened to me; and he's said, Fine, Mr. Shelton, if that's what you're telling me to do, I'll do it.

The review of defense counsel's representation is highly deferential and presumes that counsel's actions fell within a wide range of reasonable professional assistance. *Mallett v. State*, 65 S.W.3d 59, 62–63 (Tex. Crim. App. 2001). Because the record is silent, we can presume that Baylor did not testify at trial because he was following counsel's advice not to testify. This advice could have been the result of trial strategy to prevent introduction of Baylor's prior convictions, or because counsel thought Baylor would have made a poor witness.

We conclude that the trial court did not abuse its discretion in denying the motion for new trial based on ineffective assistance. It was reasonable for the court to conclude that Baylor did not meet his burden to show that counsel's performance fell below an objective standard of reasonableness in light of prevailing professional norms. Also, the court could have concluded, given the evidence in this case, that Baylor could not show a reasonable probability that the result of the proceeding would have been different but for counsel's alleged errors. Accordingly, we overrule Baylor's ineffective assistance claims.

16

## III. Conclusion

We affirm the trial court's judgment.



Bailey C. Moseley
Justice

Date Submitted: October 8, 2012
Date Decided: October 11, 2012

Do Not Publish

17