Russell Wayne LAFLEUR, Appellant,

v.

The STATE of Texas, Appellee.

No. 06–00–00082–CR.

Court of Appeals of Texas,
Texarkana.

Submitted May 14, 2002.

Decided May 15, 2002.

George Earl Renneberg, Conroe, for appellant.

Russell Wayne Lafleur, Abilene, pro se.

Dan P. Bradley, Asst. Dist. Atty., Gail Kikawa McConnell, Asst. Dist. Atty.-Appellate Section, Conroe, for appellee.

Before CORNELIUS, C.J., GRANT and ROSS, JJ.

## OPINION

Opinion by Chief Justice CORNELIUS.

Russell Wayne Lafleur was convicted of capital murder and sentenced to life imprisonment. TEX. PEN.CODE ANN. §§ 12.31(a), 19.03 (Vernon 1994). Lafleur was originally charged in a two-count indictment, along with Lonnie Rayallen Labonte, with capital murder and arson. A jury returned a verdict of guilty on both counts. The State, however, dismissed the arson count.

Court-appointed counsel for Lafleur has filed a brief pursuant to the United States Supreme Court case of *Anders v. California*[1] and certified that an appeal in this case would be frivolous. Lafleur filed a pro se response to counsel's *Anders* brief.

We have reviewed both the *Anders* brief and Lafleur's pro se response, as well as the State's brief. We have reviewed the record for legal and factual sufficiency of the evidence and have reviewed the record regarding Lafleur's request for a change of venue, all in the interest of justice. We also have reviewed the issues raised by Lafleur in his pro se response to the *Anders* brief. In its brief, the State has pointed out that Lafleur's response does not generally meet the requirements for briefing set out in TEX.R.APP. P. 38. We agree, but in the interest of justice, we have attempted to address Lafleur's contentions on the merits where possible.

### Change of Venue

Lafleur moved for a change of venue on the ground that extreme prejudice against him in Montgomery County made a fair and impartial trial impossible or highly unlikely. The motion was accompanied by statements of two residents of Montgomery County to that effect. The State responded with an affidavit of a resident stating that no prejudice existed that would prevent Lafleur from obtaining a fair and impartial trial in the county.

■ The trial court summoned a jury panel to hear the motion and read to them a summary of the facts of the case. The court noted that two newspapers, the *Conroe Courier* and the *Houston Chronicle*, as well as the radio and television stations in Houston and Conroe, had covered the events of the case. The court then asked if members of the panel were aware of the media coverage, or had knowledge of the facts of the case through some other source, and if such knowledge established in their mind a conclusion as to Lafleur's guilt or innocence. Several persons indicated they had such knowledge. Some

---

1. *Anders v. California,* 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967).

received their information from the media; all who so indicated also said they could set aside such information and render a judgment in accordance with the evidence presented in court. One panel member received his information from social contact with police officers, and he said he could set his opinion aside and make a fair determination from the evidence. Another had what he believed to be a previous personal encounter with one of the three men accused in the murders. He stated he had not formed an opinion of Lafleur's guilt or innocence. One panel member's wife had been a teacher of one of the victims. He said he would be able to follow the court's instructions regarding the law. Another panelist knew an employee of the district attorney's office, but that employee had not told her anything about the investigation. Lafleur then introduced Exhibits 1–55, which were copies of twenty-nine articles from the *Conroe Courier* and twenty-six articles from the *Houston Chronicle*.

A motion for change of venue must be supported by the defendant's own affidavit and the affidavits of at least two credible persons who are residents of the county where the prosecution is instituted, and must allege one of two possible bases for the motion, including prejudice in the county that would prevent a fair trial. TEX.CODE CRIM. PROC. ANN. art. 31.03(a)(1) (Vernon 1989). Lafleur's motion did not comply with these rules; he filed in support of his motion the unsworn declaration of two individuals, and he filed no affidavit of his own. The State filed a proper affidavit controverting the motion. Although the State did not oppose the motion on the grounds of noncompliance with the rules, we will review the trial court's denial of the motion on the merits.

To prevail on a motion for change of venue, the defendant must demonstrate that publicity about the case is pervasive, prejudicial, and inflammatory. The record must show that prejudice within the county is such that the likelihood of the defendant obtaining a fair trial by an impartial jury is doubtful. The defendant must show that the outside influences of the media affecting the community are so inherently suspect, or are so inflammatory, pervasive, or prejudicial as to raise doubt about the likelihood of his obtaining a fair trial. Review of the trial court's decision is on an abuse of discretion standard. The trial court is authorized to use the jury selection process to gauge the tenor of the community as a whole. *Dewberry v. State*, 4 S.W.3d 735, 745–46 (Tex.Crim.App.1999), *cert. denied*, 529 U.S. 1131, 120 S.Ct. 2008, 146 L.Ed.2d 958 (2000).

We have reviewed the newspaper articles offered in evidence. Some of them contain detailed accounts of evidence uncovered by police in their investigation; some contain stories about a possible codefendant who would be given immunity from prosecution to "turn state's evidence"; some contain pictures of Lafleur. Despite the admittedly detailed and extensive coverage, the trial court's examination of the prospective jurors did not indicate that they were predisposed to convict Lafleur. Lafleur brought forth no other evidence indicating that these articles and the broadcast media coverage of the murders had so influenced the community that he could not obtain a fair trial. The articles are not inflammatory or pervasive. None of the prospective jurors interviewed displayed detailed recall of the facts of the investigation that the newspaper articles reported. During voir dire of the jury panel, the trial court and the lawyers questioned a number of panelists who indicated on a written questionnaire that they had formed an opinion as to Lafleur's guilt or innocence. Thirteen jurors were excused on this basis, either on challenge for cause

or by agreement between the State and the defense. Lafleur made no further motions alleging grounds for change of venue. We conclude that the trial court did not abuse its discretion in denying Lafleur's motion for change of venue.

### Legal Sufficiency of the Evidence

▇ In considering a legal insufficiency claim, we review the relevant evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Johnson v. State*, 23 S.W.3d 1, 7 (Tex. Crim.App.2000).

Lafleur was charged with capital murder by intentionally causing the deaths of Sarah Cleary and Misty Morgan by burning, beating, and stabbing them. TEX. PEN. CODE ANN. § 19.03(a)(7)(A) (Vernon 1994).

The jury was charged under the law of parties:

A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both. Each party to the offense may be charged with commission of the offense.

A person is criminally responsible for an offense committed by the conduct of another if, acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense. Thus, depending on the circumstances, a person may be a party to an offense whether or not they were present during, or participated in, the actual commission of the offense. However, mere presence at the location of the offense does not, by itself, make one a party to the offense.

▇ Under the charge, the jury could convict Lafleur if it found that he was present at the commission of the offense and encouraged its commission by words or other acts. In reviewing the sufficiency of the evidence to support the conviction of Lafleur as a party, we may consider events occurring before, during, and after the commission of the offense, and we may rely on Lafleur's actions that show an understanding and common design to aid in the murders. *King v. State*, 29 S.W.3d 556, 564 (Tex.Crim.App.2000).

Viewed in the light most favorable to the verdict, the evidence showed the following.

Gabriel Saxton lived in Conroe with his sister, Lori Parker. On June 7, 1997, Saxton, Lori, and her boyfriend, Clay, went in Lori's Explorer to a club called Trio's. On the way, they stopped at a topless bar called Fantasy North, where Saxton, but not the other two, went inside and purchased cocaine. When they arrived at Trio's, they danced, shot pool, and drank beer. Saxton was wearing denim blue jeans, a white undershirt, and a long-sleeved green, blue, and maroon Tommy Hilfiger shirt, along with a pair of Skechers, a type of dressy hiking boot. Late that evening, Saxton was introduced to Misty Morgan by his sister. He also met Misty's friend, Sarah Cleary. Saxton danced and talked with Misty, and he testified that Misty offered him a ride home because Lori and her boyfriend wanted to leave.

At the club's closing time, Saxton went to Lori's vehicle to get his shirt and baseball cap. Saxton, Misty, and Clay then drove in Lori's vehicle to Sarah's car, dropped off Misty and Saxton, and Lori and Clay left. Sarah left and went back into the club to talk to some people, and Misty and Saxton smoked marihuana and used cocaine. Saxton remembered talking

with some friends. By that time, Sarah returned to the car. The three of them drove away from the club in Sarah's car. They first stopped at a convenience store to buy cigarettes and drinks, then went to an apartment where the two girls went inside while Saxton remained in the parking lot. He transferred some items to Misty's car: his hat, his shirt, purses, tobacco pouch, and two cellular telephones. After Misty and Sarah returned, they drove back to Fantasy North, where Saxton went in alone and purchased an additional $50.00 of cocaine. They then drove back to Conroe to drop off Saxton, with Sarah driving Misty's car. As they neared Saxton's residence, they asked Saxton if he wanted to ride with them to "take care of some business." They did not tell him what they meant, but he recalls some names being mentioned, including that of a girl named "Cat."

Misty then directed Sarah to drive to a wooded area near some railroad tracks. They rolled down the windows, sat there and used marihuana and cocaine, apparently waiting for someone. Saxton had to "use the restroom." He left the car and went into the woods, far enough away where they would not see him, estimated to be about thirty feet.

Saxton then testified that while he was "preparing to use the restroom," he noticed lights on the tops of the trees, as if someone was approaching in another vehicle. He pulled his pants back up and ran across the road in front of the car to the other side of the dirt road. He thought the approaching vehicle was a truck, due to the configuration of the headlights. He noticed three figures in the vehicle. He testified that the truck stopped about 100 feet from the girls' car, and the driver and a passenger exited the vehicle. He saw the driver of the truck pull something up off the floorboard, and saw the passenger in the truck walk to the back of the truck and remove something. Saxton then ran to the other side of the road because he thought he might be seen. The driver of the truck went to the driver's side of the girls' car, and the passenger in the truck went to the passenger side of the car. Saxton then saw the driver of the truck engage Sarah in conversation, and then the girls exited the car. The driver then grabbed Sarah and threw her to the ground and the passenger threw Misty to the ground. The driver had Sarah on the ground, and was straddling her with his knees. Saxton saw the passenger appear to strike Misty, while the driver continued to pin down Sarah, possibly choking her. The passenger quickly returned to the truck, and when the driver saw the passenger going back toward the truck, he got off Sarah and started jogging toward the truck also, to catch up with the passenger. Saxton testified on direct examination that all he could hear from the scene was mumbling. However, on cross-examination, he did not deny the truth of an earlier statement he had given to police that he heard one of the girls say something like, "Leave us alone, don't hurt us and we won't tell." Saxton then ran toward the railroad tracks, waiting for the lights of the vehicle to move out of sight. He waited ten or fifteen minutes, and when he could no longer see the lights, he returned to the girls' car.

Q. You went back toward the girls?

A. Yes.

Q. And when you got there, what did you find?

A. I saw Sarah laying at the left rear of the car. It looked like they tried to-I don't know. Her head was pretty much detached from her body. And Misty was at the rear of the car and she was laying on her back, also.

Saxton decided to pick up all of his things and get away. He grabbed his shirt and hat, and looked for the drugs. There is testimony that he removed the boots Sarah was wearing and intended to steal them, but instead he just dropped them at the scene. He also took the watches the girls were wearing, but said that he dropped those also. He denied taking one of the girl's panties, which were found away from the car. He indicated he was going to steal the car and try to get away. He started the car and drove a few feet, but noticed headlights in the mirror and was afraid the occupants of the truck were returning. He decided that it would be better if he escaped on foot. He took the cellular telephones and all of his things and began to run along the railroad tracks toward his home. One of the people from the truck apparently noticed that he was nearby and shouted obscenities at him. He remained hidden in the woods for a period of time, during which time he heard "like a woosh sound, I guess." When he was sure that the persons in the truck had again left, he returned to the car. The back seat of the car was completely engulfed in flames, and the girls were no longer on the ground. He attempted to use the cellular telephones to call his sister and 9-1-1, but the calls would not go through. Saxton stated that he was afraid to go back to the girls because he had just gotten out of jail and was on probation, and later, because he was afraid the occupants of the truck would kill him also.

Saxton then proceeded on foot back toward his home, following the railroad tracks and various highways. On the way, he dropped one of the cellular telephones, which was later found by a passerby. When he got back to the house, he took everything out of his pockets and left his clothes where his sister could wash them. He went to work the following day. When he got home, he took the telephone, as well as keys and a driver's license that he had also picked up, to his attic. He had been doing some construction work there, and he dropped the items behind the sheet rock on the wall. These were later recovered by authorities.

On cross-examination, Saxton testified that he could not identify the persons he saw murder the two girls. He admitted that when he tried to drive the car away the first time, he left the bodies of the girls lying on the road. He was afraid because he had outstanding warrants for his arrest, and the people approaching could have been the police and he had been using drugs. He originally went with the girls to the woods hoping to have sexual relations with them.

In a statement that Lafleur gave while being questioned at the Houston Arson Bureau, he stated that he saw Lonnie Labonte do something to Misty and saw Misty slump over. Lafleur said that he ran from the scene, but Labonte came back and picked him up, and that he helped Labonte burn the bodies of the girls.

Craig Manuel testified that while Lafleur and he were discussing the murders of Sarah and Misty, Lafleur said he participated in the whole deal, the cocaine deal— in the woods by Conroe. Lefleur told Manuel that he was there during the murders, and helped burn the girls in the car.

John Paul Fontenot testified that Lafleur told him he (Lafleur) was present at the murders of the two girls.

Faith Lee Weston testified that while Lafleur and she were at her house a couple of days after the murders, they saw a news story about the murders, and Lafleur said he did the murders.

We find that this evidence, viewed in the light most favorable to the prosecution, is

legally sufficient to support Lafleur's conviction for the capital murders of Misty and Sarah.

### Factual Sufficiency of the Evidence

■■■■ In a factual sufficiency review, we view the evidence in a neutral light and set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. Our review must be appropriately deferential to prevent us from substantially intruding on the fact-finder's role as the sole judge of the weight and credibility of the witnesses' testimony. *Johnson v. State*, 23 S.W.3d at 7.

In addition to the testimony summarized above with regard to legal sufficiency, we note the following, which tends to favor Lafleur:

Saxton, the main witness for the State, was unable to positively identify either of the two persons he saw murder the victims and burn their bodies that night; some of his courtroom testimony was inconsistent with earlier statements he had given to police.

The physical evidence gathered from the scene did not implicate Lafleur: the Harris County Medical Examiner's testimony concerned two badly burned bodies, with very little left from which a determination of the cause of death could be made; no blood was found on Lafleur's clothing that matched that of the victims; no DNA evidence implicated Lafleur; and no one else could positively identify Lafleur as being at the murder scene.

Although one of Lafleur's statements put him at the scene, in his videotaped statement which was played for the jury, he denied that he was present at the time of the murders.

The jury had the opportunity to view Lafleur in his videotaped statement, and they were able to evaluate his credibility and view him in person during the trial. They were also able to view the other witnesses, especially Saxton, and also evaluate his credibility. Saxton was subject to extensive cross-examination by defense counsel, as were other prosecution witnesses. Based on our review of the record, and giving proper deference to the jury's finding as the trier of fact, we cannot find that the verdict is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. We find the evidence factually sufficient to support the verdict.

### Ineffective Assistance of Counsel

In his pro se response, Lafleur raises issues of ineffective assistance of counsel. Specifically, he alleges that:

1. the witness, Craig Manuel, is alleged to have told his trial attorney that he was forced to lie and that he was threatened by a police officer. He also said that defense counsel did not adequately cross-examine him.

2. Lafleur's trial attorney failed to object to anything presented by the State;

3. Lafleur's trial counsel failed to get his confession suppressed; and

4. Lafleur's trial counsel became "furious" with him when he decided not to testify.

■■■■ We apply the standard of review for claims of ineffective assistance of counsel set out by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and by the Texas Court of Criminal Appeals in *Hernandez v. State*, 726 S.W.2d 53 (Tex.Crim.App.1986). This standard of review has two prongs. Under the first prong, the appellant must show that his counsel's performance was deficient, i.e., that counsel's representation

fell below an objective standard of reasonableness. Under the second prong, the appellant must demonstrate that the deficient performance prejudiced his defense. To demonstrate prejudice, the appellant must show a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. The review of counsel's performance is highly deferential, and we indulge in a strong presumption that counsel's actions fell within a wide range of reasonable professional assistance. An allegation of ineffective assistance made on direct appeal must be firmly grounded in the record. *See Wallace v. State,* 75 S.W.3d 576, 589 (Tex.App.-Texarkana 2002, no pet. h.).

In Manuel's statement, he said that Lafleur told him, while the two of them were sitting on the tailgate of a pickup truck at 3:00 or 4:00 a.m. one morning, that "[h]e helped burn the girls," and Manuel so testified at trial. Further, Manuel said that it was over a cocaine deal. Manuel also testified that Lafleur called him and told him not to talk to police officers without an attorney.

On cross-examination, Manuel was extensively questioned about the circumstances of and details surrounding the giving of his written statement. He was specifically asked whether he felt intimidated by his surroundings when he gave the statement. He was asked several times whether the statement was truthful. We find this vigorous cross-examination to be sufficient for constitutionally effective assistance of counsel in this regard. Even if other attorneys would have pursued a different tack regarding cross-examination of this witness, a claim of ineffective assistance cannot be sustained based on such second-guessing of trial counsel's strategy. *Passmore v. State,*

617 S.W.2d 682, 686 (Tex.Crim.App. [Panel Op.] 1981).

As to Lafleur's claim that his trial attorney failed to object to anything presented by the State, a review of the trial record establishes the contrary. Further, such a claim is so vague that we cannot determine from it whether any specific act or omission of trial counsel would meet the two-pronged requirement for demonstrating ineffective assistance.

■ Regarding whether trial counsel failed to get Lafleur's confession suppressed, an appellant claiming ineffective assistance for failure to file a motion to suppress is required to prove that the motion would have been granted. *Jackson v. State,* 973 S.W.2d 954, 957 (Tex.Crim. App.1998). The record in this case shows that a *Miranda*[2] warning was given to Lafleur before he gave the statement. Lafleur fails to establish that had a motion to suppress been filed, it would have been granted. He has failed to establish ineffective assistance in this regard.

As to Lafleur's allegation that his trial counsel became furious with him when he decided not to testify, the record shows the following:

Q. [By Defense Counsel]: Mr. Lafleur, did you tell me this morning, before we started testimony, that you had made the decision regarding whether you wished to testify or whether you wished to exercise your Constitutional rights and elect not to testify?

A. [By Lafleur]: Yes.

Q. And what is you [sic] decision at this time?

A. I would like not to testify.

**2.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Q. And we discussed this matter and your option, have you and I discussed this topic on several occasions?

A. Yes, sir.

Q. And did we discuss it at the Montgomery County jail this weekend?

A. Yes, sir.

Q. And had we discussed it before trial?

A. Yes, sir.

Q. And at an earlier time, had you told me that you wished to testify?

A. No, sir.

Q. You didn't tell me that at the jail?

A. No, sir. I told you I was thinking about it. I didn't say I wanted to testify.

Q. So, if you were leaning towards testifying, you've now made a decision in your mind that you do not wish to testify?

A. Yes, sir, due to the aggression of the prosecution. They might try to call me.

Q. And that is your choice?

A. Yes, sir.

Q. Has anybody put any pressure on you or-

A. No, sir.

Q. Has anybody told you what they think you ought to do?

A. They told me what might be in my best interest.

Q. Okay. But this is your decision?

A. Yes.

Q. Nobody threatened you, nobody intimidated you, nobody overcame your free will about this?

A. That is correct.

The record fails to substantiate Lafleur's claim. We find no ineffective assistance of counsel demonstrated by the record in this case.

The other claims raised by Lafleur in his pro se response are: 1) that a detective told Lafleur that his *Miranda* rights were violated several times; 2) that he and other witnesses were told over and over again that "a needle would be put in my arm"; and 3) that an ineligible juror, Michael David Gorney, who had been previously convicted for burglary, served on the jury.

None of these allegations is substantiated by the record, and there is no authority cited in support of any of these claims. General allegations regarding violations of *Miranda* rights, without specifying some details, cannot be considered by this Court. We are not required to scour the record for all situations where *Miranda* may be applicable and determine whether *Miranda* warnings were properly given. Any statements allegedly made to witnesses that do not appear in the record of this case cannot be considered on appeal. Lafleur's motion for new trial did not allege or substantiate any intimidation of witnesses. Finally, as to the presence of an allegedly unqualified juror on the panel, Juror Gorney's name appears twice in the record during voir dire, but in neither instance is there any mention of his having a previous burglary conviction. None of the above-referenced contentions find any support in the record.

The judgment of the trial court is affirmed.