Affirmed and Memorandum Opinion filed January 13, 2009








Affirmed and Memorandum Opinion filed January 13, 2009.

 

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-08-00340-CR

____________

 

THE STATE OF TEXAS, Appellant

 

V.

 

LONNIE RAYALLEN LABONTE, Appellee

 



 

On Appeal from the 410th
District Court

Montgomery County, Texas

Trial Court Cause No. 00-01-00216-CR

 



 

M E M O R A N D U M   O P I N I O N








In 2000, appellee was convicted of capital murder and
sentenced to life in prison.  In 2007, he filed a post-conviction motion for
DNA testing of evidence containing biological material pursuant to chapter 64
of the Texas Code of Criminal Procedure.  See Tex. Code Crim. Proc. Ann. art. 64.01 (Vernon 2006).  The
State responded with affidavits challenging the efficacy of mitochondrial DNA
testing and whether appellee had proved by a preponderance of the evidence that
he would not have been convicted if exculpatory results could be obtained.  The
trial court granted the motion.  The State appeals the trial court=s decision
pursuant to article 44.01(a)(6) of the Texas Code of Criminal Procedure.  See
Tex. Code Crim. Proc. Ann. art.
44.01(a)(6).  We affirm.

Background

The crime from which this appeal stems was the horrific
murder of two young women and the burning of their bodies.  At appellee=s trial for the
murder of Misty Morgan and Sarah Cleary, Gabriel Saxton testified that on June
7, 1997, he went to a nightclub called Trio=s with his sister,
Lori,  and her boyfriend, Clay.  On the way to Trio=s, they stopped at
Fantasy North, a topless bar, where Saxton purchased cocaine.  At Trio=s, Saxton met
Misty Morgan.  When the club closed, Morgan offered Saxton a ride home.  Saxton
rode with Morgan and her friend, Sarah Cleary, back to Fantasy North where he
bought more cocaine.  The girls then drove to Conroe to take Saxton home.  As
they neared Saxton=s residence, the girls asked Saxton if he
would like to ride with them to Atake care of some
business.@

Saxton agreed and they drove to a remote wooded area near
some railroad tracks.  They parked, rolled down the windows, and turned off the
car=s headlights. 
Saxton sat in the car with the two girls for 10 to 15 minutes while they smoked
marijuana, snorted cocaine, drank beer, and talked.  Saxton left the car and
walked approximately 30 feet into the woods to relieve himself.  Saxton
testified that before he could relieve himself he noticed the lights of an
approaching vehicle.  He pulled his pants back up and ran across the road in
front of the car to the other side of the girls= car.  He saw
three people in the approaching vehicle.  He testified that the person in the
middle had a ponytail, but he could not determine whether the individual was a
man or woman.  The configuration of the headlights indicated to him that the
vehicle was a truck.  He saw the driver of the truck pick up something from the
floorboard and saw the passenger in the truck walk to the back of the truck and
remove something.  Saxton saw the driver of the truck go to the driver=s side of the
girls= car and the
passenger in the truck went to the passenger side of the car.  The driver of
the truck engaged Cleary in conversation, and both girls exited the car.  The
driver grabbed Cleary and threw her to the ground.  At the same time, the
passenger threw Morgan to the ground.








As Saxton saw this, he started running away from the car
toward the train tracks.  He waited in the woods until the truck drove away. 
After the truck drove away, Saxton went back to the girls= car and saw that
they were both lying on the road behind the car.  He noticed that Cleary Awas in pretty bad shape. 
Blood everywhere.@  Saxton took the girls= cell phones and
his drugs; he looked for the girls= drugs, but could
not find them.  He also stole Morgan=s watch and
cigarettes[1]
and tried to take Cleary=s boots.  As he was stealing items from
the injured girls, he saw the headlights of the returning truck.  He jumped in
the car and tried to drive away, but the only road was behind the car in the
path of the truck.  He exited the car and ran back into the woods.  While in
the woods, he heard yelling, a car door slam, and a Aloud whoosh noise.@  He looked toward
the car and saw that it was on fire.  He then walked home.  Saxton did not call
the police because he was Aalready in enough trouble.@

The next morning, a bike rider discovered the burned car. 
He notified the authorities who began an extensive investigation.  In the
course of their investigation, police officers learned that Saxton had been
with the girls on the night of the fire.  After telling the authorities several
false stories of what happened that night, Saxton showed them where he had hidden
a cell phone, Morgan=s keys, and the identification.  Saxton
had dropped one of the cell phones at a local business in Conroe.  Through
interviews and cell phone records, authorities learned that appellee knew Misty
Morgan.  As a result of information received from the statements of appellee
and Russell Lafleur, authorities arrested appellee, Lafleur, and Melissa ACat@ Branon for
capital murder and arson.  








Lafleur was tried and convicted of capital murder and
sentenced to life in prison.  See Lafleur v. State, 79 S.W.3d 129 (Tex.
App.CTexarkana 2002, no
pet.).  Branon was charged with capital murder and spent more than two years in
the Montgomery County Jail until she agreed to testify against appellee in his
trial.  During her incarceration, Branon maintained that she was not present at
the scene of the murders.  Changing her story approximately two weeks before
appellee=s trial began, she
testified, under a grant of use immunity, that she was present when appellee
and Lafleur confronted the victims at the scene of the crime.  

Branon testified as follows: On June 7, 1997, she went with
appellee to a club called Sacks for a short period of time.  She and appellee
had spent the previous three days driving around in Chris Vincent=s truck selling
drugs.  Appellee had acquired the truck because Vincent was incarcerated; he
permitted appellee to take over his drug business in exchange for appellee=s promise to make
payments on the truck.  The truck did not have blood in it, and there was no
reason for anything resembling blood to Ashow up in that
truck.@  At about 1:00 in
the morning, they picked up Lafleur, took LSD and drove down a dirt road to
meet someone.  On the dirt road in a remote area, they stopped short of a car
that was ahead on the road.  Appellee and Lafleur got out of the truck and
approached the car.  The girl on the driver=s side of the car
got out and talked with appellee.  Appellee grabbed the girl and began hitting
her with his fist.  Afraid, Branon looked down toward the floorboard of the
truck and did not see anything else.  Appellee and Lafleur got back in the
truck and drove to Steven McGill=s house.  At
McGill=s house, they
picked up a gasoline can and drove back to the remote area where the car was
located.  A body was blocking the road, and the next thing she knew, the body Aended up@ in the bed of the
truck.  Appellee was in the bed of the truck with the body, and Branon heard a
man=s voice and
someone=s moaning. 
Appellee and Lafleur got back in the truck and drove up to the car.  Branon saw
a girl moving in the back seat of the car just before appellee and Lafleur
poured gasoline on the car, and the car became engulfed in flames.  

Crime scene investigators collected hair and blood from the
scene of the fire.  They eventually collected samples from stains left in the
truck that appellee was driving that night.  No match was made between appellee
and the hair, fibers, or footprints left at the scene. 








Catherine Caballero, a DNA specialist who examined the
evidence for the Texas Department of Public Safety (DPS), testified that she
examined 21 stains, a rubber bed mat, four mud flaps, and two floor mats from a
1996 Ford Ranger truck.  Caballero testified that some of the stains provided a
positive result for the presumptive tests, but such results did not indicate
that the stains contained blood.  She explained that a presumptive test is a
chemical test providing information on the possibility of blood=s being present. 
A positive presumptive test does not confirm that the stain is blood; rather,
it indicates a possibility of blood.  After more extensive tests, she could not
conclusively establish that the stains contained human blood.  Because the
subsequent tests were negative, no attempt was made to extract DNA from the
stains.  Cabellero further explained that the tests could have been negative
because the stains had deteriorated over time or through environmental
exposure.  She also theorized that cleaning agents could have caused the
substance in the stains to deteriorate.

Kristi Wamsatt, a DPS criminalist, testified that she
examined the hair collected at the crime scene.  The twelve hairs collected
from the truck were microscopically different from the hairs collected from the
victims= hairbrushes.  She
further testified that the test of the stains in the truck revealed no apparent
blood, although acknowledging the possibility of obtaining a negative result on
a stain even if the stain actually contained blood.

Butch Emmons, a crime scene investigator with the
Montgomery County Crime Scene Department, testified that he examined the pickup
truck for four days.  He marked Asmall blood stains@ on the rubber bed
mat and testified that his first test on the mat for blood was negative.  After
he wiped the dust away from the stains, a second presumptive test was positive
for blood.  Emmons testified that the blood spatter found on the bed mat
conformed to the pattern associated with beating, stabbing, or blunt trauma. 
Even though he believed the substance on the truck to be human blood, he
admitted that the chemist from DPS could not confirm his conclusion.  The
stains were re-tested in 1999, and the lab was unable to extract DNA. 
Throughout his testimony, Emmons referred to the stains as Ablood@ and testified to
his expertise in blood spatter analysis.








Appellee presented evidence of Saxton=s admission to a
friend that he had killed the girls and had burned them in their car.  Appellee
further presented the testimony of Edie Emerick, a DNA serologist with the DPS
crime lab in Houston.  Emerick=s testimony impeached prior lab results
indicating a presumptively positive test for the presence of blood on the
truck.  Emerick testified that she tested 19 stains from the bed of the truck. 
Presumptive tests for blood on the stains were negative.  Emerick explained
that a negative presumptive test could mean either that the substance is not
blood, or that the substance has been degraded by sunlight, heat, humidity, and
other environmental factors.  Emerick testified that a presumptive test reacts
with the iron in blood, so that anything containing iron, such as rust, could
result in a positive presumptive test.








Appellee was convicted of capital murder and sentenced to
life in prison.  On appeal, his conviction was affirmed.  Labonte v. State,
99 S.W.3d 801 (Tex. App.CBeaumont 2003, pet. ref=d).  On May 30,
2007, appellee filed a motion for post-conviction DNA testing in which he
requested that the court order forensic DNA testing of, among other things, 20
blood stains from the Ford Ranger truck, stains on the rubber bed mat, and
stains on the mud flaps.  Appellee specifically sought re-testing of the
evidence using mitochondrial DNA analysis.  Appellee alleged that mitochondrial
DNA analysis can be used to examine the DNA from samples that cannot be
analyzed using nuclear DNA methods, which is the method used by the DPS crime
lab in analyzing the samples prior to trial.  Appellee also asserted that (1)
the evidence had been maintained under a sufficient chain of custody to
establish its authenticity, (2) the identity of the assailants was at issue in
the original trial, and (3) if mitochondrial DNA testing produced results
specifically excluding appellee or his vehicle from the scene of the crime, he
would not have been convicted.  Specifically, if test results indicated that
the stains on the truck could not have come from the victims, he would have
been able to establish reasonable doubt as to his presence at the scene of the
murders.      In his response to the State=s opposition to
DNA testing, appellee alleged that Branon had recanted her testimony
post-trial.  Attached to appellee=s response is a
deposition given on February 10, 2004, in which Branon averred that her
testimony at appellee=s trial was incorrect.  Branon stated that
she agreed to testify at appellee=s trial because
law enforcement officers Awere drilling@ her, telling her
she would be sentenced to 40 years if she went to trial.  The officers told her
that if she testified against appellee she would Ahave a strong
possibility of going home.@  After she testified at trial, her case
was dismissed.  Branon further testified that, on the night of the murders, she
and appellee stayed at his home in New Waverly Atripping on LSD
all night.@  Branon learned details of the murders from the
detectives who were questioning her.  Prior to trial, the detectives Amentioned
everything, all the details and everything, and was kind of leading [her] into
agreeing with them.@  After detectives told her what Saxton
had said, she Apieced together@ the details from
their information.

The State challenged appellee=s motion,
asserting that he could not establish that exculpatory results could be
obtained through additional DNA testing.  The State first argued that appellee
had failed to show how mitochondrial DNA testing would provide more accurate
results than nuclear DNA testing.  Second, the State argued that the evidence
at trial was sufficient to support a conviction even if DNA testing showed that
the stains in the truck did not contain the blood of the victims.  The trial
court granted appellee=s motion, finding that appellee=s identity was an
issue and that appellee had established by a preponderance of the evidence that
he would not have been convicted if exculpatory results had been obtained
through DNA testing.  The State appeals the trial court=s order on the
grounds that (1) appellee failed to prove by a preponderance of the evidence
that he would not have been convicted if exculpatory results had been obtained
from DNA testing, and (2) the trial court erred in considering post-trial
events in ordering DNA testing.

Standard of Review








In its order, the trial court states that it heard the
motion for DNA testing on February 12, 2008.  A record of that hearing does not
appear in our record.  Our record contains appellee=s motion for DNA
testing supported by his affidavit and documents showing pretrial DNA testing,
the State=s opposition, and appellee=s response to the
State=s opposition supported
by Branon=s deposition recanting her trial testimony.  Appellee
included the original trial record as part of the appellate record.

While we defer to the trial court=s determination of
issues of historical fact and application of law to fact issues that turn on
the credibility and demeanor of the witnesses, we do not have a record of the
hearing on appellee=s motion.  The original trial record from
2000 and the exhibits attached to the motion are the only source of information
that supports appellee=s motion.  The Court of Criminal Appeals
has determined that in such a case our review is de novo because we are in as
good a position as the trial court to review the evidence.  Smith v. State,
165 S.W.3d 361, 363 (Tex. Crim. App. 2005).

Discussion

A. 
Consideration of Post-Trial Events

In its second issue, the State contends that the trial
court erred in considering post-trial events in ordering DNA testing,
specifically Branon=s post-trial recantation.  Article 64.04
provides, A[a]fter examining the results of testing under Article
64.03, the convicting court shall hold a hearing and make a finding as to
whether, had the results been available during the trial of the offense,
it is reasonably probable that the person would not have been convicted.@  Tex. Code Crim. Proc. Ann. art. 64.04.
(emphasis added)  

Because Branon did not recant until four years after the
trial, the trial court erred in considering Branon=s post-trial
recantation of her testimony, as appellee concedes.  Appellee argues, however,
that the trial court=s error is harmless because there is ample
evidence in the trial record, independent of Branon=s recantation, to
support the trial court=s determination that appellee met his
burden under article 64.03.  Therefore, we will review appellee=s motion without
considering Branon=s recantation.








B. 
Exculpatory Nature of DNA Testing

Before a trial court can order DNA testing under chapter
64, it must find that (1) evidence still exists and is in a condition making
DNA testing possible; (2) the evidence has been subjected to a proper chain of
custody; and (3) identity is an issue in the case. Tex. Crim. Proc. Code Ann. art. 64.03(a)(1).  A movant must
also establish by a preponderance of the evidence that (1) he would not have
been convicted if exculpatory results had been obtained through DNA testing;
and (2) the request is not made to unreasonably delay the sentence.  Tex. Code Crim. Proc. Ann. art.
64.03(a)(2).  To meet his burden to have testing done, appellee must prove
that, had the results of the DNA test been available at trial, there is a 51%
chance that he would not have been convicted.  See Smith v. State, 165
S.W.3d at 364.

Appellee argues that the only physical evidence tying him
to the crime scene is the blood spatter testimony of Butch Emmons.  Hairs found
inside the truck did not match the victims, nor did hair from the scene match
appellee.  Emmons testified that the stains in the back of the truck were blood
and that the blood spatter pattern was consistent with a beating or blunt force
trauma.  The only other evidence that placed appellant at the crime scene was
the accomplice testimony of Branon.  If results of mitochondrial DNA testing
showing that the stains were not blood, or that the DNA did not match that of
the victims had been introduced at trial, according to appellee, there is a 51%
chance that he would not have been convicted.

The State argues that the following evidence of appellee=s guilt,
independent of the blood spatter testimony and Branon=s testimony, is
sufficient to tie him to the offense:

$                  
Appellee
refused to give his boots to a Montgomery County detective to be compared to
footprints found at the scene.

$                  
Appellee
gave conflicting statements about his whereabouts on the night of the offense.








$                  
While
sitting alone in the interview room of the Montgomery County Sheriff=s Office during a
videotaped interview, appellee muttered, AMan, I=ve (inaudible)
fucked up.@

$                  
The
morning after the girls were murdered, appellee appeared at the home of a
friend, nervous, dirty, sweaty, and scared, and asked to use the friend=s truck because he
was in trouble and might have to leave town.

$                  
Appellee
told a co-worker that his best friend killed two girls and that appellee had
passed polygraph and DNA tests, so he did not understand why Branon wrote a
note implicating him.[2]


$                  
Appellee
told the same co-worker that on the night of the offense Athere was a
supposed mystery man that saw two guys and a girl; killed two people.@

None of the evidence cited by the State physically places
appellee at the scene of the offense.  While appellee=s comments and
actions are suspicious, they do not place him at the scene.  The State further
asserts that Lafleur=s statement from his trial places appellee
at the scene of the offense.  Because Lafleur=s statement was
not admitted at appellee=s trial, we cannot consider it.  See
Tex. Code Crim. Proc. Ann. art.
64.04.

The jury heard evidence that there was no reason for blood
to have been in the back of the truck and that Ablood spatter@ was consistent
with beating, stabbing, or blunt force trauma.  They heard this evidence
despite other testimony that the stains in the back of the truck might not have
been blood.  If mitochondrial DNA analysis shows that the stains in the truck
do not contain human blood, or, if so, do not contain the victims= blood, there is a
51% chance that the jury would have found a reasonable doubt of appellee=s guilt.








Conclusion

Disregarding Branon=s post-trial
recantation, the trial court had sufficient evidence to determine by a
preponderance of the evidence that favorable DNA results would have prevented
appellee=s conviction.  The
order of the trial court is affirmed.

 

 

/s/      Adele Hedges

Chief Justice

 

 

 

 

Panel consists of
Chief Justice Hedges and Justices Anderson and Seymore.

Publish C Tex. R. App. P. 47.2(b).

 









[1]  Saxton later discovered Morgan=s identification in the package of cigarettes.





[2]  The note stated, AI
know where I was that night; better figure out where you were.@